UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBIN MAKI, an individual,

    *Plaintiff,*

v.

ALAN J. HANKE, an individual,
CARLO SPERDUTI, an individual,
S. MILLS ROGERS, III an individual, and
IOLO GLOBAL, LLC., a Wyoming Limited
Liability Company.

Case No. 2:20-cv-706
Hon.

    *Defendants.*

_____/

## VERIFIED COMPLAINT

COMES NOW Plaintiff, ROBIN MAKI (hereafter "Plaintiff"), and sues Defendants, ALAN J. HANKE, CARLO SPERDUTI, S. MILLS ROGERS, III, and IOLO GLOBAL, LLC (hereafter collectively "Defendants"), and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff is an adult resident of Florida, and at all relevant times has been living within the Middle District of Florida.

2.    Defendant Alan J. Hanke ("Hanke") is an adult resident of Illinois, and at all relevant times has been a resident of the state of Illinois.

3.    Defendant Carlo Sperduti ("Sperduti") is an adult resident of Florida, and at all relevant times has been living within the Middle District of Florida.

4.    Defendant S. Mills Rogers, III ("Attorney Rogers" or "Rogers") is an adult resident of Georgia, and at all relevant times has been a resident of the state of Georgia.

5.     Defendant IOLO Global, LLC ("IOLO") is and at all relevant times was a Wyoming based limited liability company engaged in the business of offering financial, insurance, and banking services.

6.     This Court has original jurisdiction over the parties and claims alleged herein under 28 U.S.C. § 1331, based upon the existence of a question arising under a Federal statute, particularly under 18 U.S.C. § 1343 and 18 U.S.C. § 1964(c).

7.     This court further has supplemental jurisdiction over the State law claims alleged herein by virtue of 28 U.S.C. § 1367(a) in that the State law claims are so related to claims in this action within the court's original jurisdiction that they form part of the same case or controversy.

8.     Venue in this judicial district is appropriate under 28 U.S.C. § 1391 and Rule 1.02, Rules of the United States District Court for the Middle District of Florida, because the Defendants committed the wrongful acts alleged herein in the Middle District of Florida, the acts giving rise to the conspiracy occurred in the Middle District of Florida, the money was wired from the Middle District of Florida, and the Plaintiff was induced here by an individual that resides in the Middle District of Florida.

## **GENERAL ALLEGATIONS**

9.     Plaintiff is but one of many victims defrauded by Hanke and Attorney Rogers, who utilized phony transactional documents to induce both sophisticated and unsophisticated investors to wire funds across state lines, only to see said funds disappear without a trace. (e.g. Southern District of New York *Case No. 1:20-cv-04765-VEC*).

10.    At all times material hereto, Plaintiff was uneducated in the investment world. In fact, the $400,000.00 "investment" giving rise to this Complaint was the first time Plaintiff had ever ventured down such a path.

**Sperduti's Initial Inducement**

11.     Plaintiff's saga began in the summer of 2019, wherein she first had discussions with Sperduti about her desire to fund a charitable organization through use of funds she acquired from disposition of real property.

12.     Ultimately, in or around June 2019, Sperduti suggested that Plaintiff place her monies with IOLO, because he purportedly had millions of dollars invested through Hanke in IOLO. To date, there has been no confirmation that Sperduti had any such monies in IOLO.

13.     In order to bolster Plaintiff's confidence in Hanke, Sperduti furnished Plaintiff with an entirely bogus "Bio" on Hanke, which set forth the following, in pertinent part:

> Alan is a highly accomplished entrepreneur and investor who specializes in Banking, Finance Telecom and Aviation industries. Over the past several decades, Alan has been responsible for the creation of some of the most successful companies and compensation plans within these industries. His knowledge and expertise in these industries has allowed him to become a highly sought after mentor to individuals and a contributor to many industry magazines and periodicals. His proven track record of accomplishments in planning and leading comprehensive business strategies has contributed to his unique ability to build large international companies and independent sales organizations through personal relationships and industry contracts. Some of his main accomplishments have included driving multimillion-dollar growth and being a leader who is skilled at managing many diverse teams, negotiations, and creating successful new market startups.
>
> Currently Alan serves as the Chairman of a transactional group that provides facilitation and intake coordination to several of the world's largest private trade organizations both in the U.S. and abroad. Alan's group handles all transaction details including program details, contracting and ongoing support. Alan is now devoting his full time effort and experiences to design simple investment programs in support of the client initiatives. In addition, Alan is also currently the President of the Board Emeritus of a large international private bank and trade finance institution.
>
> *See Exhibit "A."*

14.     Upon information and belief, the "transactional group" referenced therein is IOLO, which is clearly little more than a shell corporation that has more red flags than ties to global

finance. Such red flags include, but are not limited to: (1) it was originally incorporated in 2016 under the name "Discover Financial Services, LLC;" a clear attempt to mimic the credit card giant "Discover Financial Services, Inc."; (2) its alleged business address of 1712 Pioneer Avenue, Cheyenne, Wyoming, is the headquarters of Wyoming Corporate Services, "a business-incorporation specialist that establishes firms which can be used as "shell" companies, paper entities able to hide assets," according to Reuters; (https://www.reuters.com/article/us-usa-shell-companies/special-report-a-little-house-of-secrets-on-the-great-plains-idUSTRE75R20Z20110628); (3) "IOLO Global, LLC" has absolutely no public existence, with a total of eight (8) hits on Google; (4) the lone mention of IOLO in any public forum is as far removed from the annals of global finance as one could possibly get: a Village of Lake Barrington Special Use Transfer meeting, where Defendant Hanke described himself as the "owner of EZ Credit Financing and IOLO, which provide specialty financing to consumers including rent to own options for electronics, furniture and titled assets." *See **Exhibit "B."***

15.     Of course, Plaintiff was never aware of these facts prior to the time she agreed to place her monies with IOLO, and it is evident that Sperduti, Hanke, and Attorney Rogers went to great lengths in order to avoid Plaintiff discovering the true nature of IOLO and Hanke.

16.     Sperduti was specifically aware that Plaintiff was not able to lose the $400,000.00 and was in a particularly vulnerable position. For example, on August 1, 2019, he sent Plaintiff a text message stating: "I know your situation and I want you to know I will personally take care of you. Execute the CIS today if possible and let's get rolling. I am excited for you. Your (sic) going to be thrilled." The "CIS" is the Client Information Sheet, which provides all of the banking information of the purported investor.

17.     On August 7, 2019, Plaintiff personally met with Sperduti in Naples in order to provide him with the information and documentation for the CIS.

18.     On August 20, 2019, Sperduti texted Plaintiff: "[o]k Robin, the bank compliance has requested the following: Clear copy of your passport and drivers (sic) license. Clear copy of your bank statement with dollar numbers matching the verification letter. I will be able to issue your contract immediately after receipt of these items. Recommendation: go to Staples or the like and make a scan copy not from your phone. They want a bank account statement and the verification letter must indicate the exact numbers as the account or it is red flagged."

19.     Sperduti followed up the next day and requested the documentation again. Plaintiff provided the documentation an hour later.

20.     A week later, on August 28, 2019, Sperduti stated that he was "waiting for [Hanke] to send [Plaintiff's] agreement hopefully tonight."

## The "MDA" as Instrument of Fraud

21.     The "agreement" referenced by Sperduti on August 28, 2019 is what the Defendants purported to be a legitimate Management and Deposit Agreement ("MDA") with an effective date of August 29, 2019. However, the MDA-along with numerous other documents, described in more detail below-is merely an instrument of fraud, created with the sole intent and purpose of fraudulently inducing victims such as Plaintiff into wiring funds.

22.     The "red flags" associated with the MDA are nearly as bountiful as those associated with IOLO, which include, but are not limited to: (1) a phony "transaction code," (2) purporting that Plaintiff was an "accredited investor" pursuant to the "Securities Act of 1933," even though all involved knew She was the opposite, (3) stating "that IOLO is making available their various financial, insurance, and banking services through this vehicle," even though IOLO was little more than a shell company with no such ties, (4) claiming that "Client hereby appoints IOLO to perform the specific investment services" and "IOLO, for and on behalf of Client, shall fulfill its mandate in a fiduciary capacity" even though neither Hanke nor IOLO was ever licensed and His email

signature includes a disclaimer that he "is not a United States Securities Dealer or Broker or U.S. Investment Adviser…Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction"; and, most notably (5) that Plaintiff would receive a $1,600,000.00 payment within "fifty (50) international banking days following the release of Escrow," despite the fact that is a 400% return on investment (ROI) and Plaintiff was wholly prevented from even knowing whether or not her money was ever released from escrow.

23.     Further, Plaintiff was informed that 400% return was to be considered a non-recourse loan on Defendants' end since it was going into a nonprofit 501(c)(3). This caused Plaintiff to be less suspicious than one would normally assume under similar circumstances.

24.     Notwithstanding the "red flags" set forth above, the following fraudulent assurances were promised within the MDA, all of which were specifically included as false "security," strictly to induce Plaintiff's payment, under a section entitled "Asset Surety":

**5.1** An Escrow Agreement between the Parties executed prior to Deposit is in place to ensure that the funds are not released or transferred from the IOLTA account and the entire Deposit is insured by private deposit Surety ("Surety" or "Deposit Guarantee Surety"), issued by a syndication of Surety companies or Trust and paid for by IOLO, and receipt and acceptance of the Surety is confirmed by Client.

**5.2** IOLO shall have five international banking days from the date of execution of this Agreement to provide the Escrow Agreement to Client. IOLO shall also have five international banking days from the date the Deposit is received by the above designated Bank described in Appendix C to provide the Deposit Guarantee Surety described in Section 5.1, It is agreed and understood that Client may withdraw its Deposit at any time prior to the completion of these actions. (This would be 5.2 and next two paragraphs numbered accordingly)

**5.3** In the event of any non-performance by IOLO, Client may, at its discretion, extend additional time to IOLO to cure the condition of non-performance or Client, at its discretion, may choose to request the return of its original Assets and IOLO shall comply with this request.

**5.4** Upon both Parties having executed the Agreement, and upon Client having received the Deposit Guarantee Surety IOLO shall have full authorization to

withdraw any portion of the Assets from the Deposit on account for placement under IOLO's management and utilization, including but not limited to the release of funds held under escrow.

25.     The section regarding "Asset Surety" references two (2) key additional documents that were utilized by the Defendants to further induce Plaintiff's payment by falsely bolstering the security of Her "investment" with IOLO: the "Escrow Agreement" and "Deposit Guarantee Surety."

## **S. Mills Rogers & The "Escrow Agreement"**

26.     The "Escrow Agreement" is purportedly dated September 5, 2019 and was signed by Plaintiff, Hanke and Attorney Rogers.

27.      Both the Escrow Agreement and the involvement of Attorney Rogers constitute little more than additional false security for the purpose of fraudulently inducing Plaintiff's payment.

28.     Attorney Rogers' involvement in the IOLO scam was a crucial element, choreographed by the Defendants through a staged conference call in advance of Plaintiff's payment, wherein Attorney Rogers made direct verbal assurances to Plaintiff regarding the security of her monies being held by him in escrow, the legitimacy of the "investment," and his own purported experience with Hanke/IOLO.

29.     Indeed, whenever Plaintiff questioned Sperduti or requested documentation/information regarding the "investment," Sperduti repeatedly referred her to Attorney Rogers directly, including on more than one occasion expressly stating that Plaintiff was a client of Attorney Rogers.

30.     It is evident that all Defendants, including Attorney Rogers himself, passed him off to be both a security blanket and an attorney acting on Plaintiff's behalf.

31.     Despite numerous requests for his contact information and attempts to contact Attorney Rogers, Plaintiff was never able to speak with him, confirm his receipt of her wire payment, or any other information regarding the escrow deposit.[1]

32.     However, Attorney Rogers' fraud was not limited to simply inducement, he further furnished falsified documents to the Georgia Bar in defense of a Grievance filed against him by Plaintiff. *See **Exhibit "C, Composite."**[2]*

33.     Plaintiff submits that Attorney Rogers knowingly furnished falsified documents unexecuted by him for the specific purpose of distancing himself from being involved in the transaction, while also falsely claiming that he abided by the terms of the Escrow Agreement, solely to avoid prosecution by the Georgia Bar.

34.     Without being falsely led into believing her monies would be securely overseen and controlled by Attorney Rogers acting as her attorney and escrow agent, Plaintiff would not have felt secure enough to make her $400,000.00 payment.

35.     In truth however, Attorney Rogers was merely a conduit for money being laundered directly to Hanke/IOLO, whose existence served absolutely no discernable purpose other than to further induce victims of the IOLO scam into making payment.

36.     It is evident that Attorney Rogers was a knowing participant in the IOLO fraud.

## The Evolution of Fraud Through SGI

37.     Like any other industry, fraudsters must adapt as technological advancements become more readily available to average consumers who now use the internet to conduct research.

---

[1] It should also be noted that Attorney Rogers, despite same being delivered to his address as listed with the Georgia Bar on May 27, 2020 at 10:41 a.m., has to date failed to in any way acknowledge Plaintiff's Demand Letter dated May 22, 2020.

[2] Rule 4-221.1(c) of the Georgia Bar states that such records are subject to disclosure: "Confidentiality of Investigations and Proceedings Nothing in these Rules shall prohibit the complainant, respondent, or a third party from disclosing information regarding a disciplinary proceeding, unless otherwise ordered by the Supreme Court of Georgia or a Special Master in proceedings under these Rules."

38.     In this case, the "Deposit Guarantee Surety" constitutes little more than an evolution in fraud, included along with Escrow Agreement as additional false security, with the intent that it will act as a deterrent to victims undertaking enhanced due diligence in the digital age.

39.     The misleading nature of the Deposit Guarantee Surety becomes evident simply upon hearing the name of the purported surety itself: "Sub Gallagher Investment Trust" ("SGI")[3], an obvious attempt to mislead victims into believing it is affiliated with the well-known and respected surety firm Arthur J. Gallagher & Co.

40.     Unlike the "real" Gallagher, which (as of 2017) had revenue in excess of $6 billion and approximately 31,013 employees, SGI's principal mailing address is located in the town of Midlothian, TX, which has a population of 27,049.

41.     Despite copious due diligence, Plaintiff was unable to uncover any connection between Hanke, IOLO, and SGI. It is believed that SGI is merely a fake surety for hire, which Hanke stumbled upon through contacts in the fraud community.

42.     Upon information and belief, Hanke simply paid SGI a predetermined fee to obtain the false documentation, and SGI had no other involvement and/or knowledge about what it was purporting to guaranty, or the parties involved.

43.     In addition, both Sperduti and Hanke exploited the Deposit Guarantee Surety well after inducing the Plaintiff, using it as a stall tactic on multiple occasions when questioned by Plaintiff as to the status of her funds, repeatedly claiming she had better remedies under the document than demanding repayment from Defendants.

---

[3] As of the date of the filing of this Complaint, SGI is the subject of at least two (2) pending civil matters alleging fraud, including *Case Nos. 2:19-cv-02922-TJS* and *4:19-cv-00255-WTM-CLR*. Neither of these cases have anything to do with IOLO and/or Hanke.

44.     As such, the Deposit Guarantee Surety not only fraudulently induced Plaintiff, but also acted as a smokescreen when she subsequently requested her money be returned.

45.     Inapposite to the stated objective of providing additional security to Plaintiff, it is inarguable that the lone purpose of the Deposit Guarantee Surety was to further the fraudulent scheme concocted by the Defendants and allow them to evade responsibility.

46.     In a similar fashion to the phony "Escrow Agreement," the Deposit Guarantee Surety provided false security that caused Plaintiff to avoid being overly suspicious of the IOLO transaction, and was something which Plaintiff would not have invested without having in place.

47.     Despite the glaringly fraudulent nature of same, in an abundance of caution, Plaintiff furnished a demand to SGI pursuant to the Deposit Guarantee Surety on August 21, 2020, but failed to receive any response beyond a generic reply that it was investigating Plaintiff's claim. *See **Exhibit "D, Composite."***

### Plaintiff's Wire on September 10, 2019

48.     On or about September 10, 2019, Plaintiff attempted to wire her funds to a Bank of America Account purportedly belonging to Attorney Rogers but was rejected by her local Chase Bank.

49.     Upon relaying this information to Sperduti, he requested she come to ***HIS*** local Chase branch to effectuate the transfer, and she agreed to meet him at said local branch. Upon Plaintiff's arrival at the branch, Sperduti was waiting in a cubicle with the branch manager with everything set to be executed. Sperduti was present for, and oversaw, the wire transfer of $400,000.00 from Plaintiff.

50.     Plaintiff failed to receive any confirmation from any of the Defendants that her monies were safely transferred to Attorney Rogers' account, despite many demands.

51.     From September 10, 2019 up to and until Attorney Rogers' furnishing of documents pursuant to the Bar Complaint on August 17, 2020, Plaintiff was unable to confirm either the receipt of her escrow monies by Attorney Rogers or the release of same.

52.     Documents ultimately received from Attorney Rogers in response to the Bar Complaint appear to show that Plaintiff's monies were received on September 10, 2019 and then transferred out of Attorney Rogers' account three (3) days later, incrementally, to an unknown recipient. *See Exhibit "C, Composite."*

53.     According to Attorney Rogers, through Counsel, the monies were transferred to IOLO pursuant to the Escrow Agreement. *See Exhibit "C, Composite."*

## Demand for Repayment, Stall Tactics & Downfall

54.     On December 17, 2019, Plaintiff became increasingly suspicious of the IOLO transaction and questioned Sperduti directly about the status of her monies. Sperduti stated as follows in response, later that day: "Alan told me funds were sent yesterday to a Mills. Waiting for a Mills to confirm receipt of funds via overseas wire transfer. When I get that it will be absolute."

55.     On December 19, 2019, Sperduti continued to falsely portray himself as another investor, claiming "I am in the same boat as you!" and repeatedly directing Plaintiff to Hanke, stating: "[c]all [Hanke], he is responsible," "you can contact [Hanke] direct and get refunded." Plaintiff's attempts to contact Hanke were fruitless.

56.     After taking a break over the Christmas Holiday, Sperduti continued to falsely mislead Plaintiff over the next few weeks, claiming: "they were trying to get wire out today if possible or Monday if not today" and three days later stating "[c]ertainly expect confirmation today." No monies came.

57.     The following day, New Year's Eve 2019, Sperduti became more demanding about Plaintiff contacting Hanke, stating "I have asked you nicely to direct all future correspondence to [Hanke]. I am now telling you I am not going to do this! Send ALL correspondence to [Hanke] and you may include me. Last time I will say this" and "[y]ou need to deal with [Hanke] period!"

58.     After failing to receive any response from Hanke, and feeling as if Sperduti was overly evasive for having his own money on the line, Plaintiff relayed these thoughts to Sperduti, who replied on January 10, 2020: "[a]ll I have heard is funds imminent from [Hanke] which is the same source as you. Now you're calling me a liar that I don't have a stake in this? You know what the remedy is which I have told you dozens of times. Ask [Hanke] to buy you out if you don't want to wait." Of course, being "bought out" by Hanke is markedly different than demanding her money be returned pursuant to the various documents Sperduti claimed to be an expert about.

59.     Plaintiff's contact with Hanke was equally unavailing, but he continued to reassure her that her payment was imminent, most notably on January 31, 2020, wherein he stated: "Robin, no issues. I am trying to verify a few minor details. But from what I understand the funds have already been sent to the transaction account at hsbc london and are awaiting sign off now. We should have by late Monday."

60.     As a result of the above evasions by both Sperduti and Hanke, as well as her inability to reach Attorney Rogers, in January of 2020, Plaintiff contacted the Bank of America Branch to which the funds were purportedly wired and inquired about Attorney Rogers. The manager with whom Plaintiff spoke had no record of Attorney Rogers, nor the account in question.

61.     Nearly a month later, on February 24, 2020, more excuses abounded, Sperduti claiming: "[Hanke] was in hospital for several days. He is out now and doing better. He sent me email for confirmation of funds being sent today. If that occurs today we will be paid tomorrow." The funds never came.

62.     Another month passed, with Plaintiff becoming increasingly desperate. She attempted to contact Hanke on March 20, 21, 22, 2020, only for Hanke to claim that he had no updates for her regarding her funds.

63.     Plaintiff's final contact with Sperduti came on March 31, 2020, wherein he stated: "[w]ho are you trying to scare? Go ahead and I will counter sue you bc you refuse to follow your contract and formally request your funds back. I have told you dozens of times to do this but you refuse to follow the remedy in your contract bc you prefer to cause trouble…If this was about getting your money back you could do this today."

64.     On April 8, 2020, Plaintiff made her final plea to Hanke, which received no response.

**<u>Attorney Involvement</u>**

65.     On May 6, 2020, Plaintiff contacted Hanke yet again and copied the undersigned firm on the email. *See Exhibit "E, Composite."* Hanke responded on May 7, 2020 and furnished the MDA, but no further correspondence was ever received from Hanke thereafter. *See Exhibit "E, Composite."*

66.     On or about May 22, 2020, the undersigned furnished a demand to the Defendants for the return of Plaintiff's monies. *See Exhibit "F."*

67.     The lone acknowledgement was received by Steven J. Brody, an attorney purporting to represent Hanke. To date, neither Sperduti nor Attorney Rogers have in any way responded to Plaintiff's May 22, 2020 demand.

68.     The most recent written correspondence received by Hanke's Attorney was dated June 2, 2020, wherein Attorney Brody stated: "I just exchanged text messages with Alan Hanke. He is expecting funds on Thursday." *See Exhibit "G."*

69.     The undersigned received a voicemail from Attorney Brody on June 9, 2020, but, despite numerous attempts to contact him thereafter, was wholly ignored. *See **Exhibit "H."***

70.     As of the date of the filing of this Complaint, no single Defendant in this action has made any effort, whatsoever, to repay Plaintiff, despite her numerous demands both individually and through the undersigned counsel. The entirety of Plaintiff's $400,000.00 remains unreturned, its whereabouts currently unknown.

71.     All conditions precedent to the filing of this action have occurred or been waived by Defendants or would be futile. Plaintiff has at all times acted in good faith.

72.     Plaintiff has been required to retain the law firm of Holmes Fraser, P.A. to prosecute this action and is obligated to pay said counsel a reasonable fee for its services.

<u>**COUNT I**</u>
<u>**FRAUDULENT INDUCEMENT**</u>
**(AGAINST SPERDUTI, HANKE & ROGERS)**

73.     Plaintiff re-alleges and incorporates the allegations of paragraphs one (1) through seventy-two (72) of the Complaint as if fully set forth herein.

74.     This is an action for fraud in the inducement against Defendants Sperduti, Hanke and Rogers.

75.     On or about September 10, 2019, Plaintiff wired $400,000.00 into a Bank of America Account belonging to Attorney Rogers, for the benefit of IOLO.

76.     Plaintiff was fraudulently led to believe that the $400,000.00 was going to be invested by IOLO, and that she would receive $1,600,000.00 within fifty (50) days.

77.     Defendants utilized various false documents such as the MDA, SGI Guarantee, and Escrow Agreement ("Fraudulent Agreements," collectively) in order to fraudulently mislead Plaintiff that her $400,000.00 was going to be kept safe and invested properly. These Fraudulent

Agreements were merely instruments of fraud utilized by Defendants to induce Plaintiff's payment.

78.     In order to further induce Plaintiff to enter into the Fraudulent Agreements and wire the $400,000.00 at issue, Defendants Sperduti, Hanke, and Rogers made direct statements to the Plaintiff regarding the purpose of the $400,000.00, the risks involved in the transaction, the return she would receive, the nature of IOLO's business, IOLO's financial stability and industry prowess, the security provided by the Fraudulent Documents, accounting for all aspects of the transaction.

79.     IOLO was never in a position to make investments for the Plaintiff nor act as a fiduciary, as it has no licensures of any kind, and in fact it was later learned that Hanke specifically disclaims that he "is not a United States Securities Dealer or Broker or U.S. Investment Adviser… and makes no warranties or representations as to the Buyer, Seller or Transaction." *Wynfield Inns v. Edward LeRoux Group, Inc.*, 896 F.2d 483, 490 (11th Cir. 1990); *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 907 (M.D. Fla. 2007) ("Under Florida law, "a promise is actionable as fraud ... when the promisor had a positive intent not to perform his promise, or made the promise without a present intent to perform.").

80.     Furthermore, both Hanke and Sperduti were directly involved in coaxing the Plaintiff to wire the funds under confusion and duress. Defendant Sperduti was physically present when the Plaintiff wired the funds. Both Defendants knew IOLO was a shell company, knew IOLO was incapable and unauthorized to act as a fiduciary for the Plaintiff's funds and new it was impossible to provide her a 400% ROI. Instead of accurately detailing the nature of the parties' relationship and disclosing the risks associated with such a large "investment," the MDA was generated for no purpose other than to further induce the Plaintiff to wire the funds.

81.     Plaintiff relied on Defendants' representation in this regard as an inducement to enter into the MDA and as an inducement to wire the $400,000.00 to the Bank of America Account, purportedly belonging to Defendant Rogers.

82.     At the time the Defendants made the forgoing misrepresentation, they knew, or should have reasonably known, that: no legitimate investment opportunity existed, that IOLO was never in a position to make investments for the Plaintiff nor act as a fiduciary, that it was impossible to provide Plaintiff with a 400% ROI, and that the $400,000.00 was to be converted upon receipt by Defendant Rogers in an elaborate scheme to defraud the Plaintiff.

83.     Had the Plaintiff known that there was no legitimate investment opportunity, that IOLO was never in a position to make investment on behalf of Plaintiff nor act as a fiduciary, that it was impossible to receive a 400% ROI, and that her investment would be converted in an elaborate scheme,  Plaintiff would not have entered into the Fraudulent Agreements in the first place or otherwise wired the Defendants the $400,000.00.

84.     As a result of the Defendants' intentional, fraudulent actions, Plaintiff has suffered damages in the form of lost investment opportunities and loss of the initial $400,000.00 investment. In addition, Plaintiff has been forced to incur substantial attorney fees and costs in connection with its efforts to regain possession of the $400,000.00 wire transfer and has suffered other substantial losses.

**WHEREFORE**, Plaintiff, ROBIN MAKI,  demands judgment against Defendants, ALAN J. HANKE, CARLO SPERDUTI, and S. MILLS ROGERS, for the amount of the wire transfer ($400,000.00), plus costs, interest, punitive damages and attorney's fees, and requests the Court to award other such and further relief as it deems just and proper.

## COUNT II
## CIVIL RICO: WIRE FRAUD
### (AGAINST IOLO, HANKE & ROGERS)

85.     Plaintiff re-alleges and incorporates the allegations of paragraphs one (1) through seventy-two (72) of the Complaint as if fully set forth herein.

86.     On or about September 10, 2019, Plaintiff wired $400,000.00 into a Bank of America Account belonging to Attorney Rogers, for the benefit of IOLO.

87.     Plaintiff was fraudulently led to believe that the $400,000.00 was going to be invested by IOLO, and that she would receive $1,600,000.00 within fifty (50) days.

88.      Defendants utilized various false documents such as the Fraudulent Agreements in order to fraudulently mislead Plaintiff that her $400,000.00 was going to be kept safe and invested properly. These Fraudulent Agreements were merely instruments of fraud utilized by Defendants to induce Plaintiff's payment.

89.     In order to bring a RICO claim where mail or wire fraud serves as the predicate activity, it is necessary to show that (1) the defendant intentionally participated in a scheme to defraud another of money or property, (2) the defendant used the mails or wires in furtherance of that scheme, and (3) the plaintiff relied to his detriment on the defendant's misrepresentations. *Kemp v. Am. Tel. & Tel. Co.,* 393 F.3d 1354, (11th Cir. 2004). A person injured by a RICO violation may bring a civil RICO action. § 1964(c). *Rotella v. Wood*, 528 U.S. 549, 549 (2000).

90.     It is not necessary for a plaintiff to point to affirmative misstatements in order to establish the requisite fraudulent intent of a defendant under the mail and wire fraud statutes. *Langford v. Rite Aid of Ala., Inc.,* 231 F.3d 1308, 1312 (11th Cir.2000) ("Intent to defraud need not be shown through active misrepresentation—material omissions can be fraudulent if they are intended to create a false impression."). The nondisclosure of material information, even in the

absence of any patently false statements, can also constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose. *See Ayres v. Gen. Motors Corp.,* 234 F.3d 514, 521 (11th Cir.2000). Such a duty can be judicially created where there is a special relationship of trust between the parties, or may be based on other circumstances. *Kemp at* 1360.

91.     A trust relationship was created between Plaintiff, Attorney Rogers, Hanke, and IOLO through execution of the Fraudulent Agreements wherein Attorney Rogers was to act as the escrow agent for Plaintiff's $400,000.00 and IOLO, through Hanke, was to act as a fiduciary overseeing the investment of her monies and 400% ROI within fifty (50) days.

92.     In order to further induce Plaintiff to wire the $400,000.00 to IOLO, Defendants Hanke and Rogers made direct misstatements to the Plaintiff regarding the purpose of the $400,000.00, the risks involved in the transaction, the return she would receive, the nature of IOLO's business, IOLO's financial stability and industry prowess, the security provided by the Fraudulent Documents, accounting for all aspects of the transaction.

93.     Attorney Rogers' involvement in the IOLO scam was a crucial element, choreographed by the Defendants through a staged conference call in advance of Plaintiff's $400,000.00 wire, wherein Attorney Rogers made direct verbal assurances to Plaintiff regarding the security of her monies being held by him in escrow, the legitimacy of the "investment," and his own purported experience with Hanke/IOLO.

94.     Plaintiff later came to learn that Attorney Rogers was merely a conduit for laundering her $400,000.00 directly to Hanke/IOLO, that neither Hanke nor IOLO had the proper licensure, contacts, or ability to invest her $400,000.00 and that all documents she signed and discussions she had with the Defendants were nothing more than the means utilized by Defendants to fraudulently obtain her $400,000.00.

95.     As such, Defendants intentionally participated in a scheme to defraud Plaintiff out of her $400,000.00, used the mails or wires in furtherance of that scheme by having the $400,000.00 wired to Attorney Rogers as a false escrow agent, and, most significantly, Plaintiff relied to her detriment on the Defendants' misrepresentations regarding the security of her $400,000.00 and how it would be used by IOLO.

96.     Despite numerous demands for the return of her $400,000.00, Plaintiff has yet to receive a single penny back from Defendants.

97.     Pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(5), Hanke, IOLO, and Attorney Rogers have engaged in a pattern of activity, as evidenced by this nearly identical fraud being the subject of at least one other claim, Southern District of New York *Case No. 1:20-cv-04765-VEC*.

**WHEREFORE**, Plaintiff, ROBIN MAKI,  demands judgment against Defendants, ALAN J. HANKE, IOLO GLOBAL, LLC, and S. MILLS ROGERS, for the amount of the wire transfer ($400,000.00), plus costs, interest, punitive damages and attorney's fees, and requests the Court to award other such and further relief as it deems just and proper.

<u>**COUNT III**</u>
<u>**FRAUD**</u>
**(AGAINST ALL DEFENDANTS)**

98.     Plaintiff re-alleges and incorporates the allegations of paragraphs one (1) through seventy-two (72) of the Complaint as if fully set forth herein.

99.     On or about September 10, 2019, Plaintiff wired $400,000.00 into a Bank of America Account belonging to Attorney Rogers, for the benefit of IOLO.

100.    Plaintiff was fraudulently led to believe that the $400,000.00 was going to be invested by IOLO, and that she would receive $1,600,000.00 within fifty (50) days.

101.    Defendants utilized various false documents such as the Fraudulent Agreements in order to fraudulently mislead Plaintiff that her $400,000.00 was going to be kept safe and invested properly. These Fraudulent Agreements were merely instruments of fraud utilized by Defendants to induce Plaintiff's payment.

102.    Furthermore, as set forth above, Hanke, both individually and as the CEO of IOLO, Attorney Rogers, and Sperduti made numerous knowingly false representations of fact to Plaintiff, including, but not limited to:

a.   On June 23, 2019, Sperduti sending Plaintiff a false and fraudulent document purporting to be Hanke's Bio, which fraudulently portrayed him to be a seasoned investor and IOLO being capable of making investments;

b.   Sometime in August 2019, all Defendants claiming that the $400,000.00 was secure and Attorney Rogers would be acting as Plaintiff's attorney and escrow agent, as part of a staged conference call utilized to further induce Plaintiff;

c.   On September 13, 2019, Sperduti claiming that the "the trustee is the official signatory on the surety policy," and had not signed the document, even though it is dated August 29, 2019;

d.   On September 16, 2019, Sperduti claiming "You are a client of Mills. You have a trust account with a wire receipt and a (sic) MDA which outlines all that happens" even though Attorney Rogers later claimed to the Georgia Bar that he "did not represent anyone as an attorney in this transaction";

e.   On September 24, 2019, Sperduti claiming "You don't need to do anything but wait 50 international banking days. Transaction is underway, you have a surety agreement that no matter what happens principal is protected. There is nothing to be concerned about";

f.   On October 22, 2019, Sperduti claiming "things are going as planned and you're time for payout is second week in Dec I believe";

g.   On December 13, 2019, Sperduti claiming "I just got off CC and was advised you're (sic) money ( mine too ) will be wired to Mills account early next week. Probably Tues";

h.   On December 17, 2019, Sperduti claiming "It is to be wired into his account today. You can then discuss with Mills";

i.   On December 17, 2019, Sperduti claiming "Alan told me funds were sent yesterday to a Mills. Waiting for a Mills to confirm receipt of funds via overseas wire transfer";

j.   On December 19, 2019, Sperduti claiming "You can call Mills anytime you like. You are his client";

k.   On December 19, 2019, Hanke stating "The 50 days in the program is a timeframe and not a constant we are on track to have the funds for your transaction before the end of the year";

l.   On December 31, 2019, Hanke stating "I will be checking hourly on our transfer which is imminent";

m.  On January 3, 2020, Hanke claiming "I have been told that the paperwork has been set forth and the bankers are back on the 6th and it will be processed and out immediately that day";

n.   On January 31, 2020, Hanke stating "Robin, no issues. I am trying to verify a few minor details. But from what I understand the funds have already been sent to the transaction account at hsbc london and are awaiting sign off now. We should have by late Monday";

o.  On February 24, 2020, Sperduti claiming "Alan was in hospital for several days. He is out now and doing better. He sent me email for confirmation of funds being sent today";

p.  On March 24, 2020, Hanke claiming "The issue with our deal is being resolved with banks board of directors. He has another transaction though that he is using to get everyone paid now. This week...."

103.   By making the above statements to Plaintiff, Defendants intended to deceive Plaintiff into believing her $400,000.00 was being invested and kept safe prior to the transaction, and to stymy Plaintiff's attempts to recover her monies following the transaction.

104.   Plaintiff reasonably relied on the material and fraudulent misrepresentations by, among other actions and inactions, making her $400,000.00 wire, and delaying exercising certain remedies, including the filing of this suit, reporting Defendants to the authorities, and making demand to SGI.

105.   Plaintiff would not have acted and/or failed to act as set forth above but for the fraudulent misrepresentations made by Defendants.

106.   As a result of her reasonable reliance upon Defendants' misstatements and the fraudulent conduct of Defendants, Plaintiff has been damaged, and continues suffer damage, including, but not limited to, the total loss of her $400,000.00 wire payment.

107.   Plaintiff further reserves the right to seek punitive damages against Defendants for their knowing, outrageous, and/or intentional behavior, all of which was undertaken with the sole purpose of defrauding Plaintiff into wiring $400,000.00.

**WHEREFORE**, Plaintiff, ROBIN MAKI,  demands judgment against Defendants, ALAN J. HANKE, CARLO SPERDUTI, IOLO GLOBAL, LLC, and S. MILLS ROGERS, for the amount

of the wire transfer ($400,000.00), plus costs, interest, punitive damages and attorney's fees, and requests the Court to award other such and further relief as it deems just and proper.

## COUNT IV
## VIOLATION OF FLORIDA'S DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
### (AGAINST HANKE AND IOLO)

108.    Plaintiff re-alleges and incorporates the allegations of paragraphs one (1) through seventy-two (72) of the Complaint as if fully set forth herein.

109.    Plaintiff is a consumer and/or an interested person, pursuant to § 501.203, Fla. Stat.

110.    Under Florida law, "[a] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. An "unfair practice" is "one that offends established public policy" and is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." A "deceptive practice" is one that is "likely to mislead."" *Fruitstone v. Spartan Race Inc.,* 1:20-CV-20836, 2020 WL 2781614, at *12 (S.D. Fla. May 29, 2020) (internal citations omitted, quotations in original).

111.    Hanke, individually and on behalf IOLO, personally participated in, condoned, ratified, consented, authorized, approved, acquiesced and or assisted in the commission of the illegal and or deceptive acts and, as a result, is liable to Plaintiff for damages suffered thereby.

112.    Hanke, individually and on behalf IOLO, engaged in unconscionable, unfair and/or deceptive acts or practices while in the conduct of a trade and/or commerce by procuring a $400,000.00 wire from Plaintiff as part of a fraudulent investment scheme that was concocted, orchestrated, and perpetrated by Hanke.

113.    One of the stated purposes of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

114.    Plaintiff was fraudulently induced to wire $400,000.00 for benefit of IOLO as part of an investment fraud scheme that utilized phony complex documents and false assurances to deceive Plaintiff into believing that her $400,000.00 was being invested and kept safe.

115.    The entire transaction was premised upon deception, illegal activity, and fraud, any single one of which must be deterred vehemently in order to protect similar consumers in this state such as Plaintiff.

116.    As a result of Defendants' unconscionable, unfair and/or deceptive acts or practices, Plaintiff has suffered actual damages in the amount of $400,000.00.

117.    Plaintiff has retained the undersigned firm Holmes Fraser, PA to prosecute this action and is obligated to pay a reasonable fee for such services.

118.    Pursuant to § 501.2105(1), Fla. Stat. Plaintiff is entitled to prevailing party attorney fees and hereby demands same.

119.    WHEREFORE, Plaintiff demands a judgement against ALAN J. HANKE and IOLO GLOBAL, LLC,  jointly and severally, in the amount of actual damages incurred by Plaintiff, including, without limitation, actual damages in the amount equal to $400,000.00, pre-judgment interest, an award of attorneys' fees and costs pursuant to § 501.2105, Fla. Stat., and for all such other and further relief as this Honorable Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all issues raised in the Complaint so triable.

## <u>VERIFICATION OF COMPLAINT</u>

"Under penalty of perjury, I declare that I have read the foregoing Complaint and the facts alleged therein are true and correct to the beset of my knowledge and belief."

**Robin Maki**

Respectfully submitted this _13th_ day of September 2020.

**HOLMES FRASER, P.A.**

By: */s/ John I. Silverfield*
    John I. Silverfield, Esq.
    Florida Bar No.: 94501
    Ian T. Holmes, Esq.
    Florida Bar No.: 44193
    711 5th Avenue South, Suite 200
    Naples, Florida 34102
    Tel. (239) 228-7280; Fax. (239) 790-5766
    Primary email: jsilverfield@holmesfraser.com
    Secondary email: service@holmesfraser.com
    *Attorneys for Plaintiff*